and all. Good morning, Mr. Sankoff. Good morning, Your Honor, and may it please the Court, I'd like to respectfully request the Court's permission to reserve two minutes for rebuttal. You may. Thank you, Your Honor. This is an appeal from an order granting the defendant's motion for a summary judgment, so all reasonable inferences must be drawn in favor of Judith Gray, a barefoot, 57-year-old woman who wandered two-tenths of a mile from her hospital bed and who, a jury could find, was tased while she was lying huddled at the feet of an officer who had just yanked her to the ground and who outweighed her by 75 pounds. For two reasons, the District Court's summary judgment order against Ms. Gray should be reversed. First, by May 2013, it was clearly established by this Court's Parker case and by out-of-circuit cases like Brown, Cyrus, Matos, and Myers that it is unreasonable to tase a subdued, stationary person merely for failing to comply with an oral command to present her hands. That clearly established law applies a particular force to this case because the officer here knew that Ms. Gray was a patient with mental health issues, and yet he tased her while she was on the ground merely for failing to comply with his request. Given, as I understand it, the officer was reasonably of the view that she had been taken into involuntary custody because she was a threat to herself or others. Given that, was the officer entitled to take her into custody using such force as is reasonable to compel her to come with him? I would agree, Your Honor, that he was entitled to take her into custody, but on the question of such force, although the officer may reasonably have wondered at the outset of the encounter whether some force was required, someone who knows that someone has been hospitalized in connection with Section 12 doesn't know whether that's because she's likely to take pills or to be violent. It would have taken only a matter of moments to realize that Ms. Gray was not in the violent category, and that the moment of the tasing, I want to be clear about this, the officer had himself eliminated in his view any view that she was likely to be violent. At pages 40, and particularly pages 43 and 44 of the appendix, Your Honor, the officer is clear that he tased her for refusing to listen. In his words, quote, after she was taken to the ground, she was laying with her arms under her chest and was refusing to take them out. That's at page 44 of the appendix. So at that point, would the officer have been justified in using the physical force of his strength to pull her arms behind her and cuff her? Under these circumstances, no, Your Honor, because in this particular case, his backup is on the way that he called, backup is moments away, and the scene is secure. All threats to any conceivable threat to safety has been eliminated. So all that's confronting the officer at that point is the question of how are we going to transport this woman to this hospital bed, which is nearby. There's more than that that's confronting the officer. He has an obligation, considering the status of the plaintiff, to restrain her. That's why he's trying to put the handcuffs on, so that she can't do harm to herself or others in any event. And you're saying that it's clearly established that he can't do that? I'm saying, Your Honor, that it is clearly established that he cannot tase her. And one way to see that is to compare... Well, but you have to take this a step at a time. The first question, and I think that's what Judge Keada's question is, is whether or not, having found this patient who had left without permission the facility, whether the officer had the right to restrain her by means of placing handcuffs on her, which is typically the least restrictive method or the least intrusive method of restraining somebody. I appreciate the question, Your Honor. I would say our position, consistent with the evidence that's in the record about the use of force continuum, is that the next thing to try, I'm referring to page 257, but also this Court's Parker decision... Parker is very distinguishable on the facts, I think. Respectfully, Your Honor, in every apples-to-apples comparison of the record in this case to the Parker case, the officer's conduct in Parker was less reasonable. Parker was a man who was 220 pounds and muscular, who was pulled over for drunk driving. He was belligerent, swearing, gesticulating, saying threatening things to the officers, and he physically was... Were there three officers in Parker, and didn't they use the full disabling function of the taser? I would respond to each of that, Your Honor. There were three officers in Parker, because  there were three officers, and I understand that they used the taser of actually firing the prongs that send the current that... That is true, Your Honor. That's a big difference. On the record that's before the Court, Your Honor, in this procedural posture, it wouldn't be a big difference. The cases that we've cited, Myers, Brown from the Eighth Circuit, they all acknowledge what is in the record in this case, which is that even on drive-stung mode, this is... We're talking about significant pain, and this Court's cases from Parker to Cialino, et cetera, established that officers can't just hurt somebody because they're not responding to an oral command. Going back to Judge Selya's point about the facts of Parker, at the moment that Parker was tased, admittedly with the prongs, he was having his hands... One hand pried off of another, because he was physically resisting an attempt to handcuff him. And it was at that moment that he made an assaultive move, according to what the defendants described in their district court papers. So that is quite... But our Court said in Parker that the jury could find that he was cooperating. Precisely, Your Honor. And we are saying in this case that is equally a jury argument... Could find she was cooperating? Absolutely. What she did when she turned around... And this gets into our ADA argument a little bit, Your Honor. When she turned around, she was doing what he had implicitly been asking her to do. She's turning toward the hospital, as she said, toward him. He takes her down, not because of any attack that she made or sudden move that she made, but because he interprets the physical affectations of... Manifestations of her illness, her wild eyes, her clenched hands, as if they were assaulted. But regardless of that... How could... I'm puzzled. How could a jury find that refusing to take her hands out from under her, despite the officer's repeated requests, that she was cooperating? She was cooperating in precisely the... If there was any resistance, Your Honor, it was precisely the same de minimis resistance that this Court said existed in Parker. Parker's presenting himself to the officer. That is what Ms. Gray is doing. She is lying on the ground, cowering, because she's been taken there. And she's not moving an inch. The officer's testimony is that she pulled her hands in immediately upon hitting the ground. This is at 201 and 214 of the appendix. So after that point, she doesn't move an inch. She's not trying to flee. She's not trying to avoid being taken into custody. She may well be afraid and huddled that this much larger person has yanked her to the ground. But she is not trying to go anywhere. And that is why we're talking about de minimis actions. Let me switch gears for a minute. Your argument on clearly established law, as I understand it, depends specifically on some circuit court decisions, which you've just mentioned this morning. What do you make of the Supreme Court's recent statement that the Supreme Court considers it only an arguendo proposition that you can have clearly established law in this sort of context without a Supreme Court decision? I believe you're referring to yesterday's per curiam opinion. Yes, that's right. The law in this circuit on that question is settled, so this question can... The law in this circuit is subject to what the Supreme Court says. Certainly. The Supreme Court may well take that up one day. But I would say on the merits of that you'd have to have an on-point, very specific decision from the Supreme Court. While at the same time the Supreme Court has said that circuit courts have the option of not reaching the merits, we may never have another Fourth Amendment merits ruling for the rest of time. Then why would the Supreme Court, in a unanimous per curiam opinion, put that red flag in the opinion? Well, I'm not sure there's a red flag there. What that opinion is... Obviously trying to tell us something. Well, I don't know what the Supreme Court's trying to say. I do know that what they said in that opinion is that there needs to be a very specific proposition, and here we have that. There's no way an officer could have looked at the Parker case and thought, there's a big guy who's physically resisting officers, and he was tased, and that's not okay, just because he was not cooperating with handcuffing. But it is okay to tase miscarry. I do want to make a distinction. You're putting a huge amount of weight on the two ways in which a taser can be used, because Parker involves the prongs that send a current through the body that literally keeps the body from functioning. Someone could fall, hit their head, who knows what could happen, as opposed to the drive-stun method. So to say that Parker is analogous requires us to look at those two as analogous. I think they have to be in the same place. Pepper spray and tasing, and this use of force continuum that's in the record at page 257 of the appendix, are located in the same place. There are cases like Brown and not just as consolidated cases, but the Brooks case within that is a drive-stun case. I would say here also that there's evidence in the record in which the town has conceded, this is again at page 257, that people with mental illness should not be tased at all, and they do not draw a distinction between the drive-stun and the prongs. So on the record that's before the court, particularly this procedural posture, there's no type of pain weapon, the good kind or the not as good kind, that would have been appropriate to use against Ms. Gray who's huddled on the ground. For the clearly established inquiry, do we look at what the town regulations would have? Because that would set an interesting dynamic that it would discourage towns from setting any restraints on their officers that go beyond what the minimum requirements of the law are. Well, certainly the town's policies don't govern the Fourth Amendment inquiry, but in this case we do have a concession that it shouldn't have happened, and combined with Officer Cummings' account, again at 40 and 44, that this was a tasing about refusing to listen, it brings the case very squarely under the rule of Parker. The other thing I would say is that in other cases where this court has confronted needless pain used against people, I'm thinking Cialino and those types of cases, the court hasn't parsed whether there was a particular yanking case that was on point. The question is are we in the continuum of force in the same place? Here, as Ms. Gray's activity level decreases, she goes from ambulatory to lying on the ground, the officer's use of forces increase. And unlike in Parker, where there was a movement through the continuum, backup is called, it arrives, there's trying of laying on hands, and then taser as the last resort. Here, the officer skips from just talking to Ms. Gray, barking commands at Ms. Gray while she's on the ground, to tasing her. Do I understand the way you're analyzing it now that the fact that there was some sort of backup help on the way really does not make any difference one way or the other in this case? Actually, I'm arguing almost the opposite of that, Your Honor. Well, you have mentioned it several times, but the general rule that you seem to be asking for is one which would not depend on backup on the way. Well, I do think one of the things, I see that my time has expired, but one of the factors that can be taken into account, one of the reasons why the officer's conduct is more unreasonable in this case than it was in Parker, is that the officer doesn't do what is the basic first step even of a criminal call for a DUI, which is wait for your backup before physically engaging with the person you've pulled over. I do know that I'm past time, but if I could say a word about the ADA claim, I think it would be helpful to... I think you've saved two minutes for rebuttal. Okay, thank you. May it please the court, I'm Tom Donohue and I represent the defendant's appellees, Thomas Cummings and the town of Athol. Parker is a completely different than what we have here today. In Parker, Mr. Parker did not commit a serious crime. The first circuit in Parker said that assault is a serious crime. Ms. Gray perpetrated an assault against the officer during their encounter. In Parker, he was tased when he was not resisting, and the court was clear that the reasonable jury could find, and did find in that case, that Parker was not resisting at all. He released his hand, and then he was tased in the much more significant probe mode, which is the full neuromuscular incapacitation. In Parker, he had committed no violent crime, and still was tased when he was not resisting. Throughout the encounter in Parker, he was compliant throughout. Throughout the entire seven minutes, he went through all the field sobriety tests. He gave himself up for arrest twice. That is a completely different situation than the situation that happened here, where Officer Cummings, his job is to go get a Section 12 patient who has escaped from the hospital. So when he arrives at the scene, he knows one thing, that she is a danger to herself or others, and she doesn't know which. So that would cause a reasonable officer to be wary of the situation. To what extent does the fact that the officer knows that this is a Section 12 patient, rather than someone suspected of committing a crime, to what extent does that influence the scope of the legal actions that he can take? Well, it would certainly cause a reasonable officer to be wary. More wary of a Section 12 patient than of a criminal? Well, I suppose in the context of this case, wary. It depends on the crime, Your Honor, and it depends, it's very fact specific, I would say. But it's certainly something that a reasonable officer would take into consideration. This person certainly has some significant issues, and the officer can't know whether the person is a danger to herself or others in this case. She then commits a crime, which changes the dynamics of the situation completely. The officer then, as soon as he arrives at the scene, he tells the dispatch, as soon as he's stepping out of the car, she screams out an FU, and he says, you need to go back to the hospital. And she says, I'm not going back. So what the officer then does is he calls for backup. And he reasonably follows her down the street for about 25 seconds, saying to her, hey, will you please stop and talk to me? You need to go back to the hospital. And she wouldn't stop until at one point when he's closing the distance, and certainly a reasonable officer would follow her and not wait by the side of the road for a person that he knows is a danger to herself or others to go on down the road. It is his job under Section 12 to go retrieve her and bring her back to the hospital. So as he's following her, he's closing in on the distance while he's talking to her and saying, hey, please talk to me. This isn't a situation where he got out of the car and went up to her and grabbed her and tased her. At some point, she stops and turns around. And then he is faced with a person who is clenching her teeth, clenching her fists, and as he describes it, flexing her body tightly. And then she quickly goes at him. And he is afraid of that situation, and he's on the defensive. He gets into a defensive position. He puts up his arm to hold her back, and she keeps coming at him. So at that point, he has to make this is a rapidly evolving situation. It's tense. It's uncertain. He makes the split-second decision to take her down to the ground so he can control the situation. And while they're still in contact, he makes the decision, and a very reasonable decision, including with the decision of Parker, is rather than physically fight this person who has tucked her hands under her body and has refused to give them up for handcuffing, the reasonable decision in light of Parker is, I'm going to use the taser in the less intrusive drive-stun mode so that there isn't a further physical confrontation. Let's pause at that moment. He's got her on the ground. You've got their hand. The immediate issue for us then is his decision to use force and the type of force that he decides to use reasonable. He has one option, which is to just wait there until his backup comes. He's got another option. He could try to pry her arms. He could try talking to her longer, or he could use the option he did, which is to use the drive-stun mode with the taser. In assessing whether the decision he made among those options was reasonable, don't we need to know something about the drive-stun mode of the taser? In other words, suppose that had a 5% chance of being fatal. I think we would probably conclude that was an unreasonable use of force. Supposing it had a 0% chance of any permanent injury at all, then you've got a much stronger case. Given the summary judgment ruling, what is there in the summary judgment ruling that would make some finding regarding the relative potential harmfulness of that device? Based on the summary judgment record, setting aside the brief filed by Axon in an amicus capacity where they put forward case law as we did, case law saying that it is a less painful method and that it has no long-term effects at all. This court has that case law in the science behind it, in the affidavit submitted by it, that it has essentially zero chance of any long-term effects or death. The Sixth Circuit has held, I believe in a concurring opinion, it was a 99.7% chance of people that are tased have no actual long-term or significant injury. At the summary judgment stage, I think what was before the court there was just the drive stun is less intrusive than the probe. It's nearly a pain compliance technique that is localized. It does hurt, but as soon as it's over, it doesn't hurt anymore. There's no neuromuscular incapacitation. It's not the tasing that most people think of. It's a much smaller use of force. What you've just described, is that factually before the court, who was the taser training officer, and parts of his testimony before the court, he had said that it is a less intrusive. It's also part of the taser policy that shows it as a less intrusive use of force. As far as pepper spray, this isn't in our brief, but there is a First Circuit case on pepper spray, which is Kenny versus Floyd. In the plaintiff's expert, rightly found that taser and pepper spray are both on the same intermediate levels use of force. This court in 2012 had held that pepper spray is appropriate where a plaintiff is resisting arrest or refusing police requests. A reasonable officer at this point, May of 2013, that has read certainly Parker, but also Kenny, the pepper spray case, a reasonable officer couldn't possibly think that tasing the plaintiff in this case violated any clearly established... If Kenny's not in your brief, would you send it to us on a 28-J letter, please? Yes, Your Honor. Further showing... Our first argument is there's no violation of the constitutional right. Officer Cummings acted reasonably throughout his encounter based on the threat she posed to him. But further showing that he's entitled to qualified immunity is the Fourth Circuit case of the state of Armstrong, where the officers there were granted qualified immunity, where there was no crime committed in that case. The plaintiff there was tased five times over two minutes, and he was no threat at all to the officers. Their only job was to return him to the hospital. That was Officer Cummings' job here, but it certainly rapidly escalated when she went at the officer, refused to stop coming towards the officer, and then he was forced to bring her down to the ground and make that split-second decision of, do I get into a further physical confrontation where she is shown throughout this encounter that she is not going back to the hospital peacefully, including going at her, refusing to stop, and then immediately tucking her hands and refusing to release them. Your time is close to up. I just want to remind you that we've got a fairly substantial ADA issue in this case that you haven't referred to yet. Thank you, Your Honor. It is unclear whether the ADA applies to arrests, but for this case the court does not need to decide that issue because it is so clear that in this case there were exigent circumstances and neither the officer nor the town acted with deliberate indifference. As for the officer, I won't go through the facts again, but certainly if the ADA applies, if Title II of the ADA applies to arrests, which certainly isn't clear, which has been said by the Supreme Court, and this court has even said, well, it's unclear whether the ADA applies to arrests, which is the main case, so even if it applies, which this court does not need to reach, based on the specific facts of this case, the town is entitled to summary judgment as it was, as it receives in the district court, because there were clearly exigent circumstances here where the officer gets there, his job is to bring her back, but then the events change so rapidly. Now, the term exigent circumstances doesn't appear in Title II of the ADA. It does not, Your Honor. So you want us to say that even if the ADA applies to on-the-street police encounters, there would be an exception for exigent circumstances, but that itself would be making new law in the circuit, wouldn't it? Certainly in this circuit, we would be making completely new law. The other circuits that have looked at this, the Sixth Circuit looked at it and said, well, if it applies, there were exigent circumstances in this case, so we don't need to reach the issue. The Fifth Circuit has held what we suggest is the best approach if, in fact, the ADA applies, where they have more of a bright line rule that says the ADA doesn't apply until the scene is secure and there's no more threat of harm, which in this case, certainly, as soon as the threat was over and the scene was secure, Officer Cummings got an ambulance and brought her to the hospital. But let me give you a hypothetical, not so hypothetical. There is a point at which the officer has the plaintiff down on the ground. She won't take her hands out from under her, but he has control of her at that point. He knows backup is on the way, and he knows he's not dealing with someone who he set out to look for because of criminal activity, but he's dealing with a patient who he knows has some sort of mental disability. Wouldn't it be a reasonable accommodation at that point to wait for the backup rather than to tase her? Not in this case, Your Honor. She's shown from the very beginning that she will not peacefully go back to the hospital. She then commits an assault and battery against him, so he makes the split-second decision after he has to get into a defensive position to protect himself, takes her down, he makes a split-second decision to use a taser at that point rather than further physical confrontation, which she's shown she's not going to comply, including once she tucks her hands under her body and then flexes tightly. As for the backup, the officer does not have that scene under control. He does not have this person under control, and it is always uncertain. A reasonable officer would think whether backup's going to show up, when they're going to show up, and he certainly does not have control of anything. There is no case anywhere that I'm aware of that would suggest that an officer should not have a scene secure, especially where he has just been assaulted, where he should just stay on top of her or hold her hands until backup arrives. Suppose she was partially incapacitated from the waist down and was in a wheelchair, and he ordered her to come with him, and she said, no, I'm going to flee. Would he be authorized under those circumstances? And she'll say, no, hit you. Could he tase her? Under those limited facts, I don't think so. If she hasn't committed a crime and she's just sitting in her wheelchair. Suppose she's clenched her fists and clenched her teeth and started coming at him, and then he's gone into a defensive mode, turned her around, so he's got the wheelchair facing away from him, but she won't cooperate and she has her arms at that point. That's certainly a much closer case than we have here. There's no case or robust consensus of authority that would tell officers that they couldn't use a taser in that situation if a person is committing assault against the officer. And I think if an officer in that situation couldn't tase the person who's committing an assault on him and is refusing to be arrested or be in custody, that would start to create two tracks of Fourth Amendment analysis, which the Ninth Circuit has said, the Ninth Circuit considers mental health issue during Fourth Amendment encounters. This court has not said that. The Ninth Circuit does, but when the Ninth Circuit considers that, it is clearly said, we are not creating two tracks. It's just one factor among many within the totality of circumstances that officers face. Thank you, Mr. Donohue. All right. Thank you very much. The defendant's Fourth Amendment arguments are best made to a jury, and the defendant's ADA arguments are best made to Congress. I want to take each in turn very quickly. There is no safety issue in this case. That's been admitted at the top of page six of the defendant's brief, where they say that this is a case purely about failing to respond to orders. The scene was secure. As to the drive-stun, the city's concession that people with mental health issues should never be tased makes no distinction between drive-stun and targeting. It is a blanket concession that this is improper. Judith Gray has testified that she still has headaches and that she is now afraid of police. Of course, there's a likelihood she's going to have to encounter them again, given their condition. And finally, Your Honors, the ambulance is what took the person, Ms. Gray, back to the hospital. So the notion that she needed to be wrestled with is not consistent with the record. That's at page 204. The ambulance arrived within one minute of being called. That's at 280. On the ADA issue, as Your Honor pointed out, there is no exigent circumstances exception, and the Department of Justice has been clear, since it first issued guidance in 1991, that the regulations on their face apply to the police. It specifically rejected, in connection with the communications provision, any notion that every single police encounter is exigent circumstances. What is in the regulations, particularly at 351.139 and 35104, is a notion about direct threat to safety. And there is no way a jury would be required to hold that Judith Gray was a direct threat to someone's safety when she was laying at the feet. Here's the problem I have with that argument. It was, if we assume, for purpose of argument, that there was no Fourth Amendment violation here, that he used reasonable force to bring her into his control to return her. How could we possibly then say it's unlawful if you merely add to his available information the notion that she has some unspecified type of mental illness which renders her a threat to herself or others? I don't see how that information would necessarily put the officer in a position where the officer would be compelled to make a different choice. Unlike the example I gave of the wheelchair, you know exactly what the incapacity is, you know exactly what the handicap is, you know how it manifests itself, and you know how it restricts her behavior from threatening others. All he knows here is she has some unspecified mental illness. What's he to do differently? I understand I'm past time. Two basic answers, Your Honor. One is that the text of the regulations require a reasonable modification. There may be some leeway as to what that is. And the second is the officer does know. He knows from page, he concedes at page 43 of the appendix that she has mental health issues, and the training that he received concedes that, I'm thinking this is in the 60 range of the appendix, that someone like this should never handle an emotionally disturbed person's call alone and should be kinder and gentler than this officer was. There are known ways of how to deal with that. This officer is simply dispensed with it.